UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| STELLA PATERAKOS, M.D., | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. 21 C 52 |
| v. | ) |
| | ) Judge Sara L. Ellis |
| CITY OF CHICAGO and | ) |
| CRYSTAL WARREN, | ) |
| | ) |
| Defendants. | ) |

**OPINION AND ORDER**

Plaintiff Stella Paterakos, M.D. has worked for Defendant City of Chicago for thirty years. She brought this employment discrimination suit after Defendant Crystal Warren, the Regional Director for Information and Assessment for the Department of Family and Support Services, issued her disciplinary actions. Paterakos alleges race and age discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.* (Counts I and II), and 42 U.S.C. § 1983 (Count III). She also brings claims for unlawful retaliation and interference in violation of the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.* (Counts IV and V). The City moves to dismiss the § 1983 equal protection and FMLA claims (Counts III, IV, and V) for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) [11], a motion in which Warren joins [13].[1] Although Paterakos has sufficiently alleged the elements of her equal protection claim, she can only proceed against Warren on this claim because she has not adequately alleged a basis to hold the City liable under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978). Because

---

[1] The City does not challenge Paterakos' Title VII claims (Counts I and II) and so the Court does not address them in this Opinion.

Defendants' actions could plausibly amount to FMLA interference and the Court cannot resolve the question of whether Defendants honestly suspected that Paterakos was abusing her FMLA leave at this time, the Court allows Paterakos' FMLA claims to proceed to discovery.

## BACKGROUND[2]

Paterakos, a Caucasian female over the age of forty, began working for the City's Department of Family and Support Services as an Assistant Community Living Specialist in the Information and Assessment Division of Senior Services on July 1, 2012. On January 21, 2020, Paterakos was approved for intermittent FMLA leave to take care of her elderly father. On March 20, Warren, the Regional Director for Information and Assessment, began managing the call center in City Hall, where Paterakos worked. At all relevant times, Warren knew that Paterakos was approved for FMLA leave because her father was critically ill and she was significantly involved in his care.

On her first day managing the call center, Warren harassed Paterakos for working at a desk other than her own and for taking a lunch break later than scheduled. Paterakos explained that her regular supervisor allowed her to do these things. Throughout the following weeks, Warren allegedly followed Paterakos to the bathroom and questioned whether she requested permission to go on break. On March 27, Warren told Paterakos that she could not use the lower-level bathroom in the office, even though all other employees could. Warren stated that if she saw Paterakos on the stairway leading to this bathroom at a time other than lunch or her official break, Warren would write her up "for abandoning her post." Doc. 1 ¶ 28. On April 3, Warren told Paterakos that she also had to ask for permission to take a break. The office policy

---

[2] The Court takes the facts in this section from the complaint and presumes their truth for the purpose of resolving Defendants' motions to dismiss. *See Virnich v. Vorwald*, 664 F.3d 206, 212 (7th Cir. 2011); *Local 15, Int'l Bhd. of Elec. Workers, AFL-CIO v. Exelon Corp.*, 495 F.3d 779, 782 (7th Cir. 2007).

did not require employees to seek permission to take breaks, and neither Paterakos' regular supervisor nor Warren communicated with the office that the policy had changed. Warren did not subject African American employees to similar treatment; however, other Caucasian employees over the age of forty had to receive permission to go on breaks. On April 2, Deputy Commissioner Yolanda Curry assigned Paterakos and Nancy Chico, another Caucasian employee, to a secondary call center. Paterakos' younger African American co-workers remained at City Hall. After contacting her union, Paterakos was re-assigned back to City Hall on April 13.

On April 21, Warren gave Paterakos a Notification of a Pre-Disciplinary Investigation. On April 23, Paterakos attended a pre-disciplinary hearing with union representation. Warren and Nedrick Miller, the supervisor of personnel administration, also attended by phone. Warren alleged Paterakos left her desk without authorization, failed to set her phone to "not ready" when she left her desk, failed to return on time from breaks and lunches, and used the City's facilities and work time to conduct non-City business. *Id.* ¶ 36. During the pre-disciplinary hearing, Warren stated Paterakos was "too privileged" for Warren to speak to her, which Paterakos understood to refer to "white privilege*.*" *Id*. ¶ 38. On May 2, Warren criticized Paterakos' lower than average call volume over the previous two weeks and told her that she "can transfer to another department if [she] feel[s] like [she] can't do this job." *Id*. ¶ 41. On May 12, Paterakos received a Notice of Progressive Discipline, imposing a one-day suspension for the actions addressed at the April 23 hearing.

On May 19, Warren questioned Paterakos about using her personal cell phone while at her desk. Paterakos responded that she needed to use her FMLA time to make and receive calls related to her father's care. Warren told Paterakos to make personal calls during lunch and

3

breaks, away from her desk, or to schedule FMLA time in advance because it was otherwise "too disruptive." *Id.* ¶ 43. Paterakos agreed to do so.

Warren continued to scrutinize Paterakos' work. Although another of Paterakos' supervisors advised her to attend only one session of a webinar, Warren told Paterakos she needed to attend a second session. Warren again charged Paterakos with being "incompetent," "inefficient," and "insubordinate" in a June 12 pre-disciplinary hearing. *Id.* ¶ 46. On June 26, Paterakos received another Notice of Progressive Discipline for this conduct and a three-day suspension without pay.

Throughout July 2020, Warren watched Paterakos when she exited the bathroom and left the office. On July 16, Warren questioned why Paterakos remained in the office after the end of the official workday given a prior email instructing employees to leave the office no later than 4:45 p.m. Paterakos explained she was finishing some work, but she logged out immediately and went to the bathroom. Warren waited for Paterakos to exit the bathroom and followed her to the time clock to watch her swipe out. An African American co-worker, Beverly Anderson, swiped out at the same time in full view of Warren, but Warren did not talk to her or follow her to the time clock. The following day, Warren again followed Paterakos to the time clock and watched her leave the office.

On August 26, Warren accused Paterakos of abusing her FMLA time at a third pre-disciplinary hearing because she was seen socializing around City Hall between calls. Paterakos had taken FMLA time off to make calls related to her father's care but could not explain her actions during the pre-disciplinary hearing because Warren ended the hearing abruptly. On September 9, Warren suspended Paterakos for five days without pay for abusing FMLA leave

and returning late from approved leave. At all three pre-disciplinary hearings, Warren brought and decided the charges against Paterakos.

In an August performance review, Warren told Paterakos her performance and production was "very low [and] need[ed] improvement," despite the fact that Paterakos answered a comparable number of calls as her African American co-workers who received positive reviews. *Id.* ¶¶ 57, 58. Warren shared her review of Paterakos with Paterakos' co-workers and two other members of management. Warren also berated Paterakos in front of her co-workers for failing to obtain permission to take a break and to swipe in and out when taking FMLA time in the middle of the day. And, on October 2, Warren shared with police officers stationed at City Hall that Paterakos had been suspended from work three times, was abusing her FMLA time, and would be fired soon.

On December 11, Paterakos received an email from Warren accusing her of abusing her FMLA time by socializing during her FMLA leave. Paterakos responded that she properly used FMLA leave and was only talking with other employees between phone calls or while waiting for transportation. That same day, another supervisor reprimanded Paterakos for returning from her FMLA leave one minute late.

Paterakos filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on October 2, 2020, alleging race and age discrimination. Paterakos also complained about Warren's actions to various supervisors, asking how she could avoid disciplinary action when taking FMLA leave.

## LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits. Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir.

5

1990). In considering a Rule 12(b)(6) motion, the Court accepts as true all well-pleaded facts in the plaintiff's complaint and draws all reasonable inferences from those facts in the plaintiff's favor. *Kubiak v. City of Chicago*, 810 F.3d 476, 480–81 (7th Cir. 2016). To survive a Rule 12(b)(6) motion, the complaint must assert a facially plausible claim and provide fair notice to the defendant of the claim's basis. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Adams v. City of Indianapolis*, 742 F.3d 720, 728–29 (7th Cir. 2014). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

## ANALYSIS

### I. Equal Protection Claim (Count III)

#### A. Sufficiency of Allegations of Discriminatory Intent

Initially, Defendants seek dismissal of Paterakos' equal protection claim, brought pursuant to § 1983, arguing that she has failed to sufficiently allege that Defendants had an intent to discriminate. To state an equal protection claim based on race or age discrimination, Paterakos must allege that "the defendants' actions had a discriminatory effect and were motivated by a discriminatory purpose." *Chavez v. Ill. State Police*, 251 F.3d 612, 635–36 (7th Cir. 2001). Proving discriminatory effect requires a showing that the plaintiff belongs to a protected class, is otherwise similarly situated to members of the unprotected class, and was treated differently from members of the unprotected class. *Id.* But this evidentiary standard does not apply at the pleading stage. *See Doe v. Bd. of Educ. of City of Chicago*, --- F. Supp. 3d ----, 2020 WL 1445638, at *6–7 (N.D. Ill. Mar. 24, 2020) ("[A]t this early stage of the case, the Plaintiffs need not plead more facts than necessary to give [the defendant] 'fair notice of what

the claim is and the grounds upon which it rests.'" (citation omitted)); *Smith v. City of Chicago*, 143 F. Supp. 3d 741, 755 (N.D. Ill. 2015) ("It is well-established, however, that under the federal pleading standards, a plaintiff need not plead a prima facie case because it is an evidentiary standard, not a pleading requirement.").

Although Paterakos does in places use conclusory language to describe Defendants' discriminatory intent, looking at the complaint as a whole, she provides sufficient factual allegations to give rise to an inference of discriminatory intent. Paterakos includes various examples of when Warren treated her and other Caucasian employees over the age of forty differently from African American co-workers, many of whom are under the age of forty. *See, e.g.*, Doc. 1 ¶¶ 22–23, 26, 34, 51, 57–58, 62–65. As just one specific example, Paterakos alleges that, in violation of the collective bargaining agreement, she and a Caucasian co-worker were re-assigned to a secondary call center while her younger, African American co-workers remained at City Hall. *Id.* ¶¶ 30–31. Paterakos further contends that Warren stated that she refused to speak to Paterakos because Paterakos was "too privileged." *Id.* ¶ 38. Although Paterakos will have to provide evidence to prevail on her equal protection claim, drawing all inferences in her favor, the Court finds that her allegations of discriminatory intent suffice at this stage. *See Brown v. Budz*, 398 F.3d 904, 916 n.1 (7th Cir. 2005) ("[T]his court has held that an allegation as simple as 'I was turned down a job because of my race is all a complaint has to say' to plead sufficiently race discrimination in violation of the Equal Protection clause." (citation omitted)); *Casimir v. City of Chicago*, No. 15 C 3711, 2018 WL 1695362, at *9 (N.D. Ill. Apr. 6, 2018) ("The questions of which inferences can, or should, be drawn from the statistical evidence and the evidence of plaintiffs' treatment are better suited for summary judgment or a full evidentiary hearing.").

7

### B. *Monell* Claim against the City

Although the Court finds that Paterakos has sufficiently alleged an equal protection claim, that claim against the City faces an additional hurdle because a municipality cannot be held liable under § 1983 based on *respondeat superior*. *Rossi v. City of Chicago*, 790 F.3d 729, 737 (7th Cir. 2015). But the City may be held liable under § 1983 pursuant to *Monell*, 436 U.S. at 694. To state a *Monell* claim, Paterakos must allege (1) an express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express policy, is so permanent and well-settled as to constitute a custom or usage with the force of law; or (3) a constitutional injury caused by a person with final policymaking authority. *Rossi*, 790 F.3d at 737. Here, Paterakos claims that the City maintained a policy or practice of discriminating against Caucasian employees and that Warren, a municipal agent with final policymaking authority, caused her constitutional deprivation.

To adequately allege a *Monell* policy or practice claim, Paterakos must "plead[ ] factual content that allows the court to draw the reasonable inference that the City maintained a policy, custom, or practice" that contributed to the alleged violation.[3] *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011) (citation omitted) (internal quotation marks omitted). Although the Seventh Circuit has reminded courts not to apply a "heightened pleading standard" to *Monell* claims, *White v. City of Chicago*, 829 F.3d 837, 844 (7th Cir. 2016) (quoting *Leatherman v. Tarrant Cty. Narcotics Intel. & Coordination Unit*, 507 U.S. 163, 164 (1993)), the Court nonetheless concludes that Paterakos' allegations fall short of demonstrating a widespread practice. Paterakos may rely on her own experiences at the pleading stage, *id.*, but she must still

---

[3] Although the City argues that Paterakos waived this basis for her *Monell* claim by failing to provide supporting authority, the Court finds it more appropriate to analyze the merits instead of to decide the issue on a technicality.

include some allegations to allow the inference that the City maintained a policy or practice of discrimination, as opposed to one that her injuries arose from a random event, *see Rossi*, 790 F.3d at 737 (a *Monell* claim requires "a *widespread practice* that permeates a critical mass of an institutional body," not "individual misconduct"); *Grieveson v. Anderson*, 538 F.3d 763, 774 (7th Cir. 2008) ("[I]t is necessarily more difficult for a plaintiff to demonstrate an official policy or custom based only on his own experience because what is needed is evidence that there is a true municipal policy at issue, not a random event." (citation omitted) (internal quotation marks omitted)). Here, the complaint suggests only that Warren acted in a discriminatory manner toward Paterakos, engaging in "individual misconduct" as opposed to the required "widespread practice." *Rossi*, 790 F.3d at 737. Paterakos thus cannot proceed against the City on this basis.

But Paterakos also alternatively contends that Warren had final policymaking authority. For Warren to have final policymaking authority, she "must be responsible for establishing final government policy in a particular area or on a particular issue." *Klingler v. City of Chicago*, No. 15-CV-1609, 2017 WL 3394722, at * 1 (N.D. Ill. Aug. 8, 2017) (citing *Valentino v. Vill. of S. Chi. Heights*, 575 F. 3d 664, 675–76 (7th Cir. 2009)). "State or local law determines whether a person has policymaking authority for purposes of § 1983." *Waters v. City of Chicago*, 580 F.3d 575, 581 (7th Cir. 2009). Here, Paterakos' complaint does not include plausible allegations that Warren had the authority to set policy for employment decisions. Instead, as the Seventh Circuit has recognized, the Chicago City Council and the City's Commissioner of Human Resources are the final policymakers for employment decisions. *Id.* Although Warren may have had the authority to implement employment decisions, as demonstrated by the fact that she alone determined whether to impose discipline on Paterakos, this does not equate to final policymaking authority. *See Darchak v. City of Chicago Bd. of Educ.*, 580 F.3d 622, 630 (7th Cir. 2009)

9

("Under the delegation theory, the person or entity with final policymaking authority must delegate the power to make policy, not simply the power to make decisions. 'There must be a delegation of authority to set policy for hiring and firing, not a delegation of only the final authority to hire and fire.'" (quoting *Kujawski v. Bd. of Comm'rs of Bartholomew Cnty.*, 183 F.3d 734, 739 (7th Cir. 1999))); *Gray v. Canton Twp.*, No. 19-1184, 2019 WL 5457817, at *2 (C.D. Ill. Oct. 24, 2019) ("[The defendant's] ability to hire individuals . . . does not necessarily make him the policymaker on those issues."). Because Paterakos has failed to allege a plausible basis for holding the City liable pursuant to *Monell*, she may only proceed against Warren on her equal protection claim.[4]

## II. FMLA Claims (Counts IV and V)

The FMLA entitles an employee to twelve weeks of leave per twelve-month period for a serious health condition that renders her unable to perform her job. *Smith v. Hope Sch.*, 560 F.3d 694, 699 (7th Cir. 2009) (citing 29 U.S.C. § 2612(a)(1)(D)). An employer may not interfere with or deny an employee's exercise of her right to this leave. 29 U.S.C. § 2615(a)(1). To state an FMLA interference claim, Paterakos must allege that (1) she was eligible for FMLA protection, (2) the City was covered by the FMLA, (3) she was entitled to FMLA leave, (4) she provided sufficient notice of her intent to take FMLA leave, and (5) the City denied her FMLA benefits to which she was entitled. *Preddie v. Bartholomew Consol. Sch. Corp.*, 799 F.3d 806, 816 (7th Cir. 2015). For an FMLA retaliation claim, Paterakos must allege that (1) she engaged in protected activity, (2) she suffered an adverse employment action, and (3) a causal connection exists between the two. *Riley v. City of Kokomo*, 909 F.3d 182, 188 (7th Cir. 2018).

---

[4] The Court's dismissal of the equal protection claim against the City resolves the City's argument concerning Paterakos' ability to recover punitive damages against it. The Court nonetheless notes that, should Paterakos attempt to replead the equal protection claim against the City, as Paterakos acknowledges, she cannot obtain punitive damages against the City on that claim.

10

Defendants first argue that Paterakos' FMLA interference claim fails because they never denied Paterakos an FMLA benefit. Indeed, Paterakos does not claim that Defendants denied her FMLA leave. But FMLA interference is "not limited simply to the denial of leave" and also includes "using the taking of FMLA leave as a negative factor in employment actions and discouraging an employee from using such leave." *Preddie*, 799 F.3d at 818 (quoting 29 C.F.R. § 825.220(b), (c)) (internal quotation marks omitted). Here, Paterakos alleges Defendants interfered with her rights because they subjected her to "unwarranted scrutiny" and "unwarranted disciplinary actions and suspensions." Doc. 1 ¶ 101. The conditions Warren put on Paterakos' use of FMLA leave, such as requiring permission to take breaks and scheduling FMLA time in advance, could have plausibly discouraged Paterakos from taking her leave. *See Baer v. Wabash Ctr. Inc.*, No. 4:15-CV-0094, 2016 WL 1610590, at *2 (N.D. Ind. Apr. 21, 2016) (the plaintiff sufficiently stated an FMLA interference claim based on the employer's placement of a condition on the employee's exercise of FMLA leave that could have discouraged her from taking the leave). Similarly, the complaint raises the plausible inference that Paterakos' taking of FMLA leave negatively factored into her disciplinary hearings and suspensions.[5] *See Lewis v. Sch. Dist. #70*, 523 F.3d 730, 743 (7th Cir. 2008) (question of fact existed as to whether performance problems forming the basis of discipline directly resulted from the plaintiff's exercise of her FMLA rights). The fact that Paterakos continued to take leave despite the conditions and disciplinary suspensions does not matter. *See Davis v. Gov't Emp. Ins. Co.*, No. 1:19-cv-2723, 2021 WL 3492983, at *5 (S.D. Ind. Aug. 9, 2021) ("An employer doesn't have to

---

[5] Defendants ask the Court to find that they imposed discipline on Paterakos for reasons unrelated to her FMLA leave, referring to the disciplinary notices they attached to their motion to dismiss. The Court finds that any disputes related to the reason for imposition of discipline are more appropriate for resolution at a later stage.

succeed in discouraging an employee from taking FMLA leave to interfere with that employee's FMLA rights.").

Defendants also argue that Paterakos' FMLA interference and retaliation claims fail because Paterakos admits that Defendants disciplined her for alleged abuse of leave. "[A]n employer's honest suspicion that the employee was not using his medical leave for its intended purpose is enough to defeat the employee's substantive rights FMLA claim." *Crouch v. Whirlpool Corp.*, 447 F.3d 984, 986 (7th Cir. 2006). Whether Defendants honestly believed that Paterakos was abusing her leave is typically a factual question more appropriate for summary judgment unless the Court finds that Paterakos has pleaded herself out of court. *See Smith v. Yelp, Inc.*, No. 20 CV 1166, 2021 WL 1192576, at *4 (N.D. Ill. Mar. 30, 2021). Paterakos disputes whether the actions forming the basis of her suspension actually constituted a misuse of FMLA leave, given the conditions that Warren placed on her use of that leave, and her complaint calls into question whether Defendants honestly believed that she misused leave or used that as a pretext. Therefore, the Court cannot conclude that Paterakos has pleaded herself out of court and instead concludes that the FMLA claims must proceed to discovery.

## CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part the City's motion to dismiss [11] and denies Warren's motion to dismiss [13]. The Court dismisses the equal protection claim (Count III) against the City without prejudice.

Dated: October 7, 2021

                                                                SARA L. ELLIS
                                                                United States District Judge